UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  1/20/2023
```

------------------------------------------------------------------X
                                                                  :
OSMONDO SMITH,                                                     :
                                                                  :
                                      Petitioner,                 :
                                                                  :                20-cv-9708 (LJL)
               -v-                                                :
                                                                  :              OPINION AND ORDER
THE STATE OF NEW YORK,                                            :
                                                                  :
                                      Respondent.                 :
                                                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

     *Pro se* Petitioner Osmondo Smith ("Petitioner" or "Smith"),[1] a New York state prisoner currently incarcerated at Great Meadow Correctional Facility, petitions for a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. He seeks relief from his sentence of incarceration after conviction following a jury trial in New York Supreme Court, Bronx County, of Murder in the Second Degree, New York Penal Law ("NYPL") § 125.25(01). Smith was sentenced to a term of incarceration of twenty-five years to life.

     Petitioner seeks relief on the following grounds: (1) his conviction was against the weight and credibility of the evidence and therefore in violation of his right to due process under the Fourteenth Amendment of the United States Constitution; (2) two 911 calls were incorrectly received as evidence under the excited utterance exception to the rule against hearsay and his Confrontation Clause rights under the Sixth Amendment to the United States Constitution; (3) the state court's denial of his application to obtain sealed arrest records deprived him of his right

---

[1] Petitioner is also referred to as "Ozzy" or "Ozzie" in the record, but for the purposes of this Opinion and Order, the Court will refer to him as "Petitioner" or "Smith."

to present a complete defense; (4) the photo identification procedure used to identify him was unduly suggestive; (5) the trial court's deadlock instruction to the jury violated his right to due process under the Fourteenth Amendment; and (6) the trial court failed to subject Petitioner to mental health evaluation prior to trial to determine his competency to stand trial. Dkt. No. 5. Petitioner also filed a letter asserting an "additional ground" based on (7) ineffective assistance of trial counsel due to counsel's failure to request a mental health evaluation and their performance during trial related to his previously asserted claims. Dkt. No. 9. Finally, Petitioner requests that the Court appoint counsel to represent him. Dkt. No. 35.

For the following reasons, the Petition is denied and the request for appointment of counsel is denied.

## BACKGROUND

### I.    The Underlying Offense

The following facts are taken from the petition and the appended record. Given the Petitioner's state court conviction, the facts are "summarize[d] in the light most favorable to the verdict." *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012) (per curiam); *see also Alexander v. Royce*, 2021 WL 1192022, at *1 (S.D.N.Y. Mar. 30, 2021) (same). Petitioner was convicted in New York Supreme Court, Bronx County, following a jury trial, for the September 1, 2012 murder of Yusef Middleton ("Yusef")[2] at 1030 Boynton Avenue in the Bronx.

### A.    The Victim and the Crime Scene

On the night of August 31, 2012, and the early morning of September 1, 2012, Petitioner was with Yusef, Yusef's cousins Sidney Middleton ("Sidney")[3] and Tamekia Middleton

---

[2] Yusef is also referred to as "Po" or "Poe" in the record, but for the purposes of this opinion and order, the Court will refer to him as "Yusef." Dkt. No. 26 at 61, 81, 217.

[3] Sidney is also referred to as "Black" in the record, but for the purposes of this opinion and order, the Court will refer to him as "Sidney." Dkt. No. 26 at 62, 81, 217.

2

("Tamekia"), and others in front of an apartment building at 1030 Boynton Avenue in the Bronx, New York.  Dkt. No. 26 at 60–62.[4]  The group was drinking together.  *Id.* at 63.  At some point in the evening, Petitioner approached the others and began "smacking the cups out their hands" and "snatching money out of their hands."  *Id*. at 63, 163, 166, 221–22.  Sidney told Petitioner, "[Y]ou not going to keep doing that because I'm not a little kid no more. . . .  You're going to stop smacking money out [of] our hands or we're going to make you get up the block."  *Id.* at 63.  In response, Petitioner "made a phone call," "told someone on the phone to bring him a gun," and walked off toward Bruckner Boulevard nearby.  *Id.* at 64, 83, 225.  Sidney told him "you don't have to make them calls.  It ain't even that serious."  *Id*. at 225.

### B.    The Shooting

Later that evening, Petitioner returned in a taxicab, exited the cab near Bruckner Boulevard, and walked toward the group in front of 1030 Boynton Avenue.  *Id*. at 65–66, 225–26.  He was wearing shorts that were burgundy or red and a black shirt.  *Id.* at 179, 228.  Tamekia and Sidney observed him kneeling and reaching toward his sock twice as if he had a firearm in an ankle holster.  *Id.* at 65–66, 227–28.  Sidney told Yusef to "be on point" because he "just felt it was going to be a problem when [he] saw [Petitioner] get out of the taxi cab, because he was standing low."  *Id*. at 226–27.  At the same time, Tamekia exhorted that everyone should come upstairs because "y'all know [Petitioner] called for that gun."  *Id.* at 64.  Tamekia and others went into the apartment but Yusef, Sidney, and one other person remained on the street.  *Id*. at 65–66.  Tamekia came back down the steps inside the building and peeked her head out to see what Petitioner was doing and witnessed a "black little gun" in Petitioner's hand.  *Id*. at 66.  As Petitioner approached, he put his hand in his right pocket and told Sidney and Yusef, "Y'all

---

[4] Sidney and Tamekia are brother and sister.  *Id.* at 62, 214.

trying to play me?"  *Id*. at 229.  Yusef said to Petitioner "What you got, a gun?" and reached for

Petitioner's hand which was in his right pocket.  *Id*. at 230.  In response, Petitioner jumped back

and pulled a .38 snub nose revolver from that pocket.  *Id*. at 69, 230–31, 234.

After first pointing the revolver at Sidney, Petitioner turned his attention to Yusef, who

had taken off running into the street behind a van.  *Id*. at 67–69, 231.  After Petitioner did so,

Sidney ran into the building.  *Id*. at 231.  Tamekia and Sidney then heard two gunshots; Tamekia

then saw Yusef run into the building with Petitioner following him.  *Id*. at 69, 231.  After Yusef

entered the building, Petitioner turned around and walked out of the building.  *Id*. at 69.  Sidney

heard Yusef yell "I'm hit" and saw him collapse on the steps inside the building.  *Id*. at 69, 231–

32.  Shortly after 4:00 a.m. on September 1, 2012, Yusef was declared dead at Jacobi Hospital.

*Id*. at 352.

### C.     The 911 Calls

After the shooting, the police received two 911 calls concerning the incident.  The first

call was from Tamekia, who told the 911 operator, "I need an ambulance at 1030 Boynton. . . .

My cousin just got shot.  Please. . . .  1030 Boynton . . . on the second floor please."  Dkt. No.

25-1 at 5; *see also* Dkt. No. 26 at 126, 390.  Tamekia provided her real name.  Dkt. No. 26 at

126.  The second call was from an unidentified individual who told the operator, "Yo, somebody

just got shot. . . . at 1030 Boynton," and reported that the victim was a male who had been shot in

the stomach, adding that, "It's like he's dying right now."  Dkt. No. 25-1 at 5.  At one point, the

caller could be heard saying to the victim, "Hang on, Poe."  *Id.*  The caller told the operator that

the shooter was "[a] black guy" wearing "[a]ll black, black and red," and requested an

ambulance before hanging up.  *Id.* at 6; Dkt. No. 26 at 363–65.

### D.     The Identification

A few hours after the shooting, Detective Rene Narvaez of the New York City Police

Department ("NYPD") met Tamekia and her sister, Annanetta Middleton ("Annanetta"), at the 43rd Precinct. Dkt. No. 26-1 at 10. Tamekia told the police that an individual whom she identified as "Ozzie" shot her cousin. *Id*. at 11. Tamekia stated that she had seen the Petitioner earlier that evening and knew him from the "old" neighborhood on the west side of the Bronx. *Id*. at 16.

Detective Narvaez then asked Tamekia to identify the shooter from pictures on the NYPD's photo manager system on the computer that he pulled up after typing in the name "Ozzie" and searching for black males between the ages of thirty to forty years old. *Id*. at 11–13. After each photo was displayed, she responded "that's not him." *Id*. at 13. Detective Narvaez showed Tamekia several photos in succession. *Id*. at 13–14. Detective Narvaez did not preserve copies of any of the other photos. *Id*. at 22.

Eventually, Annanetta, who was attempting to find Petitioner's full name and address, gave the detective "Smith" as Ozzie's last name. *Id*. at 13. Detective Narvaez typed the name into the database. *Id*. After viewing between ten to fourteen photos, a photo of the Petitioner appeared on the screen and Tamekia stated, "Yep that's him. That's Ozzie." *Id*. at 14. The detective printed the photo out and Tamekia wrote on it "That the man who shot my cousin Yusfe [sic]." Dkt. 25-5 at 2. She also signed and dated the photo. *Id*.; Dkt. No. 26-1 at 14.

### E.     The Arrest

Around 5:45 a.m. on September 1, 2012, following Tamekia's identification of Petitioner, Detective Narvaez traveled to Petitioner's address with several officers of the Bronx Homicide Task Force. Dkt. No. 26 at 330, 350–52, 358. Detective Narvaez knew at this point that Yusef was deceased. *Id*. at 352. Petitioner answered the door and identified himself as "Ozzie." *Id.* at 331. After Petitioner stepped into the hallway, Detective Narvaez placed him under arrest. *Id.* at 331–32. Petitioner appeared to be intoxicated and was wearing a black shirt and red shorts. *Id*.

at 332–34, 353.  None of the officers told him to put on any clothes.  *Id*. at 354.  Detective Narvaez did not recover a weapon from Petitioner or his apartment or inspect Petitioner's hands or clothing for gunshot residue.  *Id*. at 354–56.

## II.    Criminal Proceedings

On September 28, 2012, Petitioner was indicted by the Grand Jury of Bronx County of Murder in the Second Degree, NYPL § 125.25(1), Manslaughter in the First Degree, *id*. § 125.20(1), and Criminal Possession of a Weapon in the Second Degree, *id*. § 265.03(1)(b).  Dkt. 25 ¶ 5.

### A.    Pretrial Motions

At a pretrial *Wade* hearing, Petitioner moved to suppress the identification obtained through the photo identification procedure used to identify Smith as Yusef's alleged killer on the grounds that the procedure was unduly suggestive.  Dkt. 26-1 at 26.  After the hearing, the trial court denied the motion to suppress the photo identification in a written opinion.  Dkt. 25-5.  The court first ruled that the viewing of the photo of the Petitioner was not an identification but a confirmation.  It ruled: "Tracy Clark knew the person who shot at her cousin [and] knew defendant for several years from the old neighborhood" and "gave the detective the name she knew him by and a description."  *Id.* at 5.  "The detective simply used the photo manager system as a tool in his search for the person both witnesses knew in order to confirm his identity."  *Id.*  The court concluded that "[t]he viewing of the 10-15 photos could not be deemed suggestive as the witness knew the person she was looking for."  *Id.*

The court also ruled, in the alternative, that "the procedure used here was not unduly suggestive as the witness identified the defendant after she viewed approximately 10-15 photos of individuals who fit the same descriptive parameters in sequential order" and there was "no evidence that Ms. Clark's identification of the defendant from the sequential photographic array

was tainted by any undue suggestion." *Id.*  The court noted, "[t]he photographs were of black males approximately 30 to 40 years of age, known to the NYPD as using the name 'Ozzie Smith.'" *Id.*

Before trial, Petitioner also moved to unseal arrest records pertaining to an alleged altercation between Yusef and another individual.  Dkt. 26-1 at 2–3, 58–60.  Petitioner's trial counsel told the court that Yusef "had been charged with assaulting some other individual," and that "further investigation" into this individual was necessary "since my client maintains he didn't commit the crime and somebody else obviously did, because Mr. Middleton was shot." *Id.* at 2–3.  During voir dire, Justice Torres of the New York Supreme Court said he "was under the mistaken [belief] that [he] had already addressed" the motion to unseal, and expressly denied the motion.  Dkt. 26-2 at 233.  He stated, "I'm not unsealing.  I don't think there is anything there that goes to the relevant issue that would be before this jury." *Id.*

### B.      Petitioner's Trial and Sentencing

At trial, several witnesses testified for the State.  They included Tamekia and Sidney, who testified as eyewitnesses; NYPD Officers Sean Sterling and Pavel Santos, who responded to the shooting; Detective Narvaez, who investigated the shooting and arrested Petitioner; Detective Anthony Ribustello, who investigated the crime scene; Dr. Christine Landi, who performed an autopsy on Yusef; Detective Rodney Rodriguez, who examined the bullet recovered during the autopsy of Yusef.  In addition, the jury heard the two 911 calls made shortly after the shooting and watched lengthy excerpts of surveillance footage showing the outside of 1030 Boynton Avenue before, during, and after the shooting.

The prosecution introduced the two 911 calls at trial under the "excited utterance" exception under New York State law to the rule against hearsay.  Dkt. No. 26 at 119–20; *see also People v. Brown*, 517 N.E.2d 515, 517–18 (N.Y. 1987) (defining the parameters of the state's

excited utterance exception).  The first call was Tamekia calling for an ambulance after Yusef

was shot.  *Id*. at 114.  The second call was from an unidentified male who described the

perpetrator as wearing black and red.  *Id*. at 384.  Defense counsel objected to the admission of

the second call, arguing that the caller was not in "an excited or panic [sic] state."  *Id*. at 361.

The jury deliberated for five days.  Over the course of their deliberations, the jurors

submitted eighteen notes, three of which said they were at an impasse.  *Id*. at 625, 634, 637–38;

*see also* Dkt. No. 27-9 (juror's notes).  One of the notes the jury submitted requested to see

Petitioner walk across the room, so that the jurors could compare his gait to that of the assailant

captured on surveillance video.  Dkt. No. 26 at 549–50; Dkt. No. 27-9 at ECF p. 5.  The court

denied this request with both parties' consent.  Dkt. No. 26 at 550.  At the end of the fourth day

of deliberations, Friday, December 4, 2015, the jurors told the court that they were "at an

impasse and need[ed] guidance on how to proceed."  Dkt No. 27-9 at ECF p. 14.  The court told

the jurors that they were to break for the day and to "get refreshed this weekend, come back here

Monday and continue, and we will see where we are on Monday."  Dkt. No. 26 at 627.  When

the jurors returned after the weekend, the jury submitted another note to the court indicating that

they were "still at an impasse."  Dkt No. 27-9 at ECF p. 16.  The court then told the jury "first I

told you only [to] consider the second charge if you found defendant not guilty of the first

charge.  But now I am allowing you to consider the second charge on its own."  Dkt. No. 26 at

636.  The jury then submitted another note, indicating that "[t]he majority of jurors feel

disenfranchised by the discussion of the second charge.  Do we need a majority vote or a

unanimous vote?"  *Id*. at 638; Dkt. No. 27-9 at ECF p. 17.  The court then administered an *Allen*

charge, encouraging the jury to come to a unanimous verdict.  Dkt. No. 26 at 642–46.  In

relevant part, the court charged the jury as follows:

> As I told you in my initial instructions, any verdict you return on any count
> whether guilty or not guilty must be unanimous.  If you cannot reach a unanimous
> agreement on a particular count, you cannot return a verdict on that count and a
> new trial will have to be scheduled before a different jury. . . .  I also want to let
> you know that it is not uncommon for a jury to have difficulty in reaching a
> unanimous verdict.  And it's not uncommon for a jury to believe that they will
> never be able to reach a unanimous verdict.  But after further deliberations, most
> juries are able to reach a unanimous verdict.  And so I am going to ask you in a
> few minutes to continue your deliberations. . . .  [A]ll of you prospective jurors
> called in this case you were the ones in whom both sides expressed confidence.
> Both sides were convinced that each of you would be fair and impartial, that each
> of you would listen carefully to the evidence, to the arguments, to the law, and
> that each of you would deliberate with your fellow jurors and work hard to reach
> a unanimous verdict that was consistent with the law and the evidence and you
> have done so thus far.  But both sides continue to have confidence in you, as I do,
> that you will be at some point be able to reach a unanimous verdict.  We hope that
> you will. . . .  I want to emphasize that I am not asking any juror to violate his or
> her conscious [sic] or to abandon his or her best judgment.  Any verdict you reach
> must be the verdict or each juror and mere acquiescence in the conclusion of
> others is not what we are asking you to do.  But I am asking you to continue
> deliberating and to resume your deliberations with an open mind.  Start with a
> fresh slate if you are so inclined.  Don't feel bound by how you felt before
> whether you voted conviction or whether you voted for acquittal.  Have the
> courage to be flexible. . . .  Again, please make every effort consistent with your
> conscience and the evidence in this case to harmonize your views and decisions
> with those of your fellow jurors. . . .  So in accord with your oath and your
> promise to me at the beginning of the trial, please continue to deliberate with a
> view towards reaching an agreement.

*Id*. at 642–46.  After further deliberations, the jury returned a verdict finding Petitioner guilty of

murder in the second degree.  *Id*. at 648–50.

At sentencing, Petitioner's attorney referred back to Yusef's sealed arrest records: "I have

reason to believe there would be a basis that there were other people who might be interested in

doing harm to Yusef Middleton, including individuals involved in two incidents which occurred

about a month prior to his demise which have nothing to do with my client."  Dkt. 26-3 at 10.

Petitioner was sentenced to twenty-five years to life in prison.  *Id.* at 11.

C.       Petitioner's Direct Appeal

Petitioner appealed the jury's verdict to the New York State Supreme Court, Appellate Division, First Department, on five grounds: (1) the murder conviction was against the weight of the evidence; (2) Petitioner was denied a fair trial when the prosecution introduced 911 call records that contained hearsay statements, where the callers neither said that they saw the shooting nor identified Petitioner as the shooter; (3) the photo identification violated his rights to due process because it was based on an unpreserved photo array; (4) Petitioner was denied his due process rights to present a defense when the trial court denied his motion to unseal records regarding the victim's assault arrest and denied the juror's request to see Petitioner walk; and (5) Petitioner's sentence should be reduced to reflect mitigating factors.  Dkt. No. 25-6.

The Appellate Division affirmed Petitioner's conviction on June 4, 2019.  *See People v. Smith*, 102 N.Y.S.3d 569, 570–71 (1st Dep't 2019).  The court held that the verdict was not against the weight of the evidence and that there was no basis for disturbing the jury's credibility determinations.  *Id.* at 570.  It also held that the court properly admitted the two 911 calls as excited utterances, noting that Petitioner "did not preserve his claim that the . . . callers did not indicate that they had seen the crime," that they found "it was inferable from the circumstances that the callers had the opportunity to observe personally what they described," and that "[i]n any event, all the information in the calls was cumulative to other evidence."  *Id.*  The court further held that Petitioner's arguments regarding the photo identification were "without merit."  *Id.*  It concluded that the identification was confirmatory as "[t]he witness knew defendant for several years and gave the police a shortened form of his first name" and "[t]he use of the photographs was solely for the purpose of finding the person the witness had already named."  *Id.* (citing *People v. Gissendanner*, 399 N.E.2d 924, 930 (N.Y. 1979)).  Finally, the court held that "to the extent the issue was reviewable," the trial court had providently exercised its discretion in

denying Petitioner's request for sealed records of the deceased's arrest for assault: "Defendant's claim that those sealed records contained information relevant or helpful to his defense is based on speculation." *Id.* at 571.  The court "perceive[d] no basis for reducing [Petitioner's] sentence." *Id.*

Petitioner, with the assistance of counsel, sought leave to appeal to the New York Court of Appeals.  Dkt No. 25-9.  He presented two reasons to grant leave: (1) the trial court violated Petitioner's right to a fair trial by allowing the prosecution to introduce prejudicial hearsay statements contained in the 911 call that there was a shooting and that the assailant was wearing black and red; and (2) the trial court deprived Petitioner of his right to due process by denying his motion to unseal records that were relevant to the accusations against him.  *Id.*  The Court of Appeals denied Petitioner leave to appeal on August 26, 2019.  *People v. Smith*, 133 N.E.3d 429 (Table) (N.Y. 2019).

## PROCEDURAL HISTORY

Petitioner filed this petition *pro se* in this Court on November 17, 2020.  Dkt. No. 1.  He filed an amended petition on December 8, 2020.  Dkt. No. 5.  He then filed a letter with an "additional ground" of ineffective assistance of counsel on January 7, 2021, which this Court, recognizing the solicitude granted to a *pro se* Petitioner, treats as an amended petition inclusive of the claims raised in his petition filed December 8, 2020.  Dkt. Nos. 9, 29.  The State of New York submitted its response, including a memorandum of law in opposition to Petitioner's application, on July 19, 2021.  Dkt. No. 25.  Petitioner submitted a reply brief on August 9, 2021.  Dkt. No. 27.  The State of New York submitted an additional response in opposition to the ineffective assistance of counsel claim on November 23, 2021.  Dkt. No. 30.  Petitioner filed another letter to the Court on December 1, 2021.  Dkt. No. 31.  Petitioner requested the appointment of *pro bono* counsel on July 11, 2022.  Dkt. No. 35.

## LEGAL STANDARD

The Court's review of Petitioner's habeas petition is governed by AEDPA, 28 U.S.C. § 2254, which provides for a deferential review of a state court's ruling. *See Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009).

## I.    Timeliness

A person seeking relief under Section 2254 must satisfy several procedural requirements. Before a district court can proceed to the merits of a petitioner's claims, it must determine that the petition is timely. A petitioner must file an application for a writ of habeas corpus within one year of his conviction becoming final. *See* 28 U.S.C. § 2244(d)(1). A conviction becomes final following the "denial of certiorari" or "when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s]," that is, ninety days after a final determination by the highest state court to which a direct appeal can be taken. *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)).

A petitioner may file an amended petition after AEDPA's one-year time limit if it relates back to the timely petition. FRCP 15(c)(1)(B) provides that an untimely claim raised in an amended pleading may only be deemed timely if it arose out of the same conduct, transaction, or occurrence set forth in the original pleading. *See Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 815 (2d Cir. 2000) ("In determining whether the claim arises out of the same conduct or occurrence, '[t]he pertinent inquiry . . . is whether the original complaint gave the defendant fair notice of the newly alleged claims.'" (internal citation omitted)). The Supreme Court has held that "[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005). The fact that an untimely claim arose out of the same trial and conviction as the original

pleading is not, in itself, sufficient to satisfy the requirement that it arose out of the same

"conduct, transaction, or occurrence." *Id.* at 662–64.

## II.     Exhaustion and Procedural Default

The Court must also determine whether the petitioner has exhausted the state court

remedies that were available to him.  28 U.S.C. § 2254(b)(1)(A).  Generally, "[a]n application

for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State

court shall not be granted unless . . . the applicant has exhausted the remedies available in the

courts of the State."  *Id.*  "An applicant shall not be deemed to have exhausted the remedies

available in the courts of the State . . .  if he has the right under the law of the State to raise, by

any available procedure, the question presented."  *Id.* § 2254(c); *see also Jackson v. Conway*,

763 F.3d 115, 133 (2d Cir. 2014) (describing necessity of a prisoner to "exhaust all of his

available state remedies before a federal court can consider his habeas application").  The

exhaustion requirement exists to ensure that a state prisoner has given the State "the opportunity

to pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin v. Reese*,

541 U.S. 27, 29 (2004) (citation and internal quotation marks omitted); *Coleman v. Thompson*,

501 U.S. 722, 731 (1991) ("This exhaustion requirement is . . .  grounded in principles of comity;

in a federal system, the States should have the first opportunity to address and correct alleged

violations of state prisoner's federal rights.").  In New York, a petitioner invokes "one complete

round" of review by appealing an issue to the Appellate Division, and then seeking leave to

appeal to the New York Court of Appeals.  *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005);

*see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (describing exhaustion requirement as

requiring "one complete round of the State's established appellate review process").  Moreover,

"when a state court rejects a petitioner's claim as either unpreserved or without merit, the

conclusive presumption is that the adjudication rested on the merits."  *Hawkins v. Costello*, 460

F.3d 238, 242 (2d Cir. 2006).

Courts in the Second Circuit apply a two-step analysis to determine whether a claim has been properly exhausted in state court:

> First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . .  Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

*Johnson v. Kirkpatrick*, 2011 WL 3328643, at *11 (S.D.N.Y. Aug. 3, 2011) (quoting *Diaz v. Coombe*, 1997 WL 529608 at *3 (S.D.N.Y. June 12, 1997)).

Exhaustion requires that state prisoners "fairly" present their claims to the highest state court for review.  *Boerckel*, 526 U.S. at 839–40, 848 (citing *Wilwording v. Swenson*, 404 U.S. 249, 249–250 (1971)).  A "fair" presentation of claims requires appellate review where such review is available "in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Smalls v. Lee*, 2016 WL 5334986, at *5 (S.D.N.Y. Sept. 22, 2016) (quoting *Baldwin*, 541 U.S. at 29). "While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'"  *Jackson*, 763 F.3d at 133 (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).  "[T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation."  *Daye v. Att'y Gen. of N.Y.¸* 696 F.2d 186, 194 (2d Cir. 1982) (en banc).  A claim,

however, is generally not "fairly presented" to a state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin*, 541 U.S. at 32. Further, the claim must be presented with some specificity: "a general appeal to a constitutional guarantee as broad as due process" is insufficient "to present the 'substance' of such a claim to a state court." *Gray v. Netherland*, 518 U.S. 152, 163 (1996) (citing *Anderson v. Harless*, 459 U.S. 4, 7 (1982)).

A procedurally defaulted claim may be reviewed by a federal habeas court when the petitioner shows "cause for the procedural default, and prejudice resulting therefrom." *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 1991) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). A petitioner can show "cause" for a procedural default when (1) "the factual or legal basis for a claim was not reasonably available," (2) "some interference by state officials made compliance impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (internal quotation marks and citation omitted). The "'prejudice' requirement is met by establishing 'actual prejudice resulting from the errors of which [Petitioner] complains.'" *Gutierrez v. Smith*, 702 F.3d 103, 112 (2d Cir. 2012) (quoting *United States v. Frady*, 456 U.S. 152, 168 (1982)). The error must have resulted in "substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (citation omitted).

A petitioner may also overcome the bar of procedural default upon a showing that he is "actually innocent." *See Murray*, 477 U.S. at 495–96 ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," "the principles of comity and finality that inform the concepts of cause and prejudice must yield

15

to the imperative of correcting a fundamentally unjust incarceration."). "In order to demonstrate actual innocence in a so-called collateral proceeding, a petitioner must present 'new reliable evidence that was not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000) (quoting *Schlup v. Delo*, 513 U.S. 298, 299 (1995)). "[N]ew reliable evidence" is "evidence not heard by the jury." *Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012). "The petitioner's burden in making a gateway showing of actual innocence is deliberately 'demanding.'" *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). The standard of innocence in this context "references 'factual innocence, not mere legal insufficiency.'" *Id*. at 657 (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## III.   Merits

Even after a petitioner has cleared AEDPA's procedural hoops, there are substantial obstacles to relief. AEDPA provides that courts may not grant habeas petitions filed by state prisoners unless the adjudication of their claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

As for the first prong, the Supreme Court has "interpreted § 2254(d)(1) as giving independent meanings to the 'contrary to' and 'unreasonable application' clauses." *Overton v. Newton*, 295 F.3d 270, 275 (2d Cir. 2002) (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). "A state court decision is 'contrary to' clearly established federal law as determined by the Supreme Court 'if the state court arrives at a conclusion opposite to that reached by [the Supreme

Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Id.* (citing *Williams*, 529 U.S. at 413). "A state court decision involves an 'unreasonable application' of clearly established federal law as determined by the Supreme Court when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Jones v. West*, 555 F.3d 90, 96 (2d Cir. 2009) (quoting *Williams*, 529 U.S. at 413). Such application of federal law must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). "The state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *White*, 572 U.S. at 420); *see also Sorto v. Herbert*, 497 F.3d 163, 169 (2d Cir. 2007) ("[I]t is well-established in this Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain *habeas* relief."). The Supreme Court has held that Section 2254(d)(1) "would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).

As for the second prong, "[a] state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" *Drake*, 553 F.3d at 239 (quoting 28 U.S.C. § 2254(e)(1)). A state court's factual determination may not be deemed unreasonable "merely because [a reviewing court] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Instead, Section 2254(d)(2) requires a reviewing court to "accord the state trial court

substantial deference." *Id.* at 314.  If "'[r]easonable minds reviewing the record might disagree'

about the finding in question, 'on habeas review that does not suffice to supersede the trial

court's . . . determination.'"  *Id.* (alterations in original) (citation omitted).

## IV.  *Pro Se* Filings

The Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66,

72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they suggest," *Pabon

v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks and citations omitted).

## DISCUSSION

Petitioner brings seven claims.  One of those claims—the ineffective assistance of

counsel claim—is untimely raised insofar that it is premised on acts other than the failure to

request a mental health evaluation.  Further, Petitioner has procedurally defaulted on five of his

claims.  Irrespective of timeliness and procedural default, all of Petitioner's claims fail on the

merits.  For those reasons, the petition is denied and the request for appointment of counsel is

denied.

## I.    Timeliness

Petitioner filed an ineffective assistance of counsel claim on January 7, 2021, on the basis

that his trial counsel failed to request a mental health evaluation.  Dkt. No. 9 at 3.  As noted in a

previous order, this Court grants solicitude to *pro se* Petitioner's filing and treats this as an

amended petition inclusive of his previous grounds asserted in his timely amended petition.[5]

Dkt. No. 29.  In his January filing, he also argues that trial counsel "failed to object" when the

detective admitted that several procedures were not followed; the detective failed to produce his

memo log; he was identified based on an unpreserved photo array; and the 911 calls were

---

[5] Although the first amendment is as of right, the Court grants leave for further amendment under
Federal Rule of Civil Procedure 15(a)(2).

admitted into evidence.  Dkt. No. 9 at 3–5.  The State argues that Petitioner's ineffective assistance of counsel claim is untimely and meritless.  Dkt. No. 30.

The New York State Court of Appeals denied Petitioner leave to appeal his conviction on August 26, 2019.  Therefore, Petitioner's conviction became final for purposes of the AEDPA ninety days later, on November 24, 2019.  Petitioner's *pro se* petition, dated November 17, 2020, is therefore timely.  Petitioner did not send his letter, which the Court is treating as an amended petition, until December 29, 2020.  That amended petition is therefore untimely.

The pertinent inquiry, therefore, is whether Petitioner's claims arise out of the same conduct, transaction, or occurrence as was set forth in his original habeas petition.  Petitioner's ineffective assistance of counsel claim based on his counsel's failure to request a mental health evaluation meets that standard.  In his original timely petition, Petitioner claims that he "was suppose[d] to [get] a mental health evaluation before any further proceeding was to process during trial court [sic]."  Dkt. No. 5 at ECF p. 14.  He further clarifies his claim in the timely petition as, "730 evaluation for mental health in part.  Counsel failed to object to such issue during trial court."  *Id.* at ECF p. 25.  Given that Petitioner raised the issue of his failure to receive a mental competency evaluation in his original pleading, and later in the pleading attributed that failure to an omission by his trial counsel, the amended ineffective assistance claim relates back to the original pleading.  The facts supporting Petitioner's new ground for relief do not "differ in both time and type from those the original pleading set forth."  *Mayle*, 545 U.S. at 650.  This Court finds that the original pleading gave the State fair notice of the newly alleged claim, *see Fama*, 235 F.3d at 815, and accordingly the newly alleged claim relates back to the original pleading for timeliness purposes.

The remainder of Petitioner's bases for his ineffective assistance of counsel claim do not relate back to the timely petition.  Unlike Petitioner's claim arising out of the failure to request a mental health evaluation, Petitioner nowhere asserts that his counsel was ineffective with respect to challenging or "objecting to" the following events: the detective did not follow procedures; the detective failed to produce the memo log; admission of the photo array; or the 911 calls. Although Petitioner's original amended petition, construed liberally, describes these facts as errors by the court or the jury, he nowhere mentions his trial attorney's conduct as the cause of those errors.  (Petitioner's attorney, in fact, did challenge and "object" to these purported errors at the trial and evidentiary hearing.)  *See, e.g.*, *Nicholas v. Smith*, 2006 WL 8442055, at *3 (E.D.N.Y. Oct. 27, 2006) (describing how a common core of operative facts uniting an unvoluntary guilty plea and ineffective assistance was "the efforts – or lack thereof – of his attorney . . . to explain or communicate the elements.").  The Court therefore finds the remaining bases for ineffective assistance of counsel to be untimely asserted.[6]

## II.    Exhaustion and Procedural Default

### A.  Exhaustion

Petitioner has submitted a mixed petition of unexhausted and exhausted claims.  All but Petitioner's ineffective assistance of counsel claim are exhausted because he no longer has the

---

[6] Petitioner also filed another amended petition on December 1, 2021.  Dkt. No. 31.  That amended petition is untimely.  Further, the issues asserted in the amended petition plainly do not "relate back" to the timely petition.  In the letter, Petitioner asserts a newfound *Brady* issue, and further alleges that he received ineffective assistance of counsel, including that trial counsel failed to "diligently impeach Tracy Clark," *id.* at 5, failed to object to prosecutorial misconduct, *id.*, failed to object during juror deliberations, *id*. at 6, and failed to object to the reference to the red shorts, *id*., among others.  All of those claims lack merit under the deferential standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Petitioner's attorney also did, in fact, raise many of these issues before the trial court.  Finally, the additional claims are untimely asserted and do not relate back to the original timely petition, which makes no mention of his attorney's conduct on any of those issues.  Those claims are denied.

"right under the law of the State to raise, by any available procedure, the question presented."

*Id.* § 2254(c).  However, Petitioner has procedurally defaulted on four of those claims.  A portion

of Petitioner's ineffective assistance of counsel claim is unexhausted.

Petitioner exhausted: (1) his claim regarding the denial of his motion to unseal Yusef's

arrest records and (2) his claim that the two 911 calls were improperly admitted as evidence at

trial.  He appealed both claims to the Appellate Division and the New York Court of Appeals.

*See* Dkt. No. 25-9.  That is sufficient to properly exhaust both claims.  *See Castille v. Peoples*,

489 U.S. 346, 349 (1989) ("[O]nce the state courts have ruled upon a claim, it is not necessary

for a petitioner 'to ask the state for collateral relief, based upon the same evidence and issues

already decided by direct review.'" (quoting *Brown v. Allen*, 344 U.S. 443, 447–449 (1953))).

Because those claims were presented to the highest state court, they also are not procedurally

defaulted.  Petitioner may seek review in this Court of those claims.

Petitioner's claims that (1) his conviction was against the weight of the evidence and (2)

the introduction of identification testimony based on an unpreserved photo array violated his due

process rights are exhausted but procedurally defaulted.  Petitioner raised those claims to the

Appellate Division.  Dkt. No. 25-6.  However, he omitted those claims from his letter seeking

leave to appeal from the Court of Appeals, *see* Dkt. No. 25-9.  In *Grey*, 933 F.2d 117, the Second

Circuit held that claims that were raised to the Appellate Division but were brought to the

attention of the Court of Appeals only through the brief to the Appellate Division that was

attached to the letter application to the Court of Appeals were not fairly presented to the highest

state court and thus were procedurally defaulted.  *Id.* at 119–20.  Those facts are

indistinguishable from the facts confronting Petitioner here.  Although Petitioner attached his

briefs to the Appellate Division in his letter to the Court of Appeals, see Dkt. No. 25-9 at 7, the

letter itself does not challenge the sufficiency of the evidence and makes no mention of the photo array.  The Court thus "deems th[ose] claims exhausted" because there is an "absence of available State corrective process [for those claims] under § 2254(b)(1)(B)(i)," *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001); *see also Reese v. Alexander*, 37 F. App'x 5, 8 (2d Cir. 2002) (same), but that "finding of exhaustion does not help petitioner . . . because the federal aspect of this claim was not presented to the state courts," *Reese*, 37 F. App'x at 8 (summary order); *see also Grey*, 933 F.2d at 120 (stating that where a claim is procedurally barred from state court, a petitioner "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)," and is accordingly procedurally defaulted).

Petitioner did not raise on direct appeal at all his claims regarding the failure to implement a mental health evaluation and his Fourteenth Amendment challenge to the deadlocked jury instruction.  Those claims are exhausted, but procedurally defaulted because Petitioner has not provided the State any "opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin*, 541 U.S. at 29 (citation and internal quotation marks omitted); *see also Aparicio*, 269 F.3d at 90 ("[W]hen 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." (citing *Coleman*, 501 U.S. at 735 n.1)).  There is an absence of "available State corrective process" for addressing those claims. Under New York law, Petitioner is "entitled to one (and only one) appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals," *Aparicio*, 269 F.3d at 91 (citing N.Y. Crim. Proc. Law § 450.10(1); N.Y. Court R. § 500.10(a)), and having failed to raise these claims available on direct appeal, Petitioner may not seek collateral relief on the basis of

those claims in New York courts because both claims are determinable from the record, *see* N.Y. Crim. Proc. Law § 440.10(2)(c); *see also Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (same).

Finally, Petitioner did not raise his ineffective assistance of trial counsel claim in his direct appeal, nor did he file a motion to vacate his conviction.  Petitioner may still file a collateral motion under New York Criminal Procedure Law § 440.10 on the basis of ineffective assistance of counsel with respect to his mental health and competency.  *See* N.Y. Crim. Proc. Law § 440.10(2)(b); *id.* § 440.10(2)(c) (carving out an exception for "ineffective assistance of counsel"); *see*, *e.g., Walden v. Walcott*, 2020 WL 13220026, at *1 (S.D.N.Y. Nov. 5, 2020) (describing ineffective assistance claims as unexhausted).  Those claims of ineffective assistance are "mixed" in their reliance on the record.  They rely on some facts appearing in the trial record—such as the failure to request a mental health evaluation and his conduct at trial—and on facts outside the record, such as his attorney's awareness of Petitioner's mental health conditions.  *See*, *e.g.*, *Pierotti v. Walsh*, 834 F.3d 171, 179 (2d Cir. 2016) ("His claim depended on some facts appearing on the trial record, such as his trial counsel's failure to secure an accommodation for Pierotti's hearing impairment, but his claim ultimately turns on facts appearing outside the record, such as his trial counsel's alleged awareness of Pierotti's hearing impairment.").  The "appropriate forum" for such mixed claims of ineffective assistance under New York law are collateral proceedings under Section 440.10.  *Id.* at 178; *see also People v. Brown*, 382 N.E.2d 1149, 1150 (N.Y. 1978) ("[I]n the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or postconviction proceeding brought under CPL 440.10.").  Petitioner's ineffective assistance of counsel claim is unexhausted.

"A district court confronted with a mixed petition 'can offer the petitioner the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims.'" *Pratt v. Greiner*, 306 F.3d 1190, 1196–97 (2d Cir. 2002) (internal quotation marks omitted) (quoting *McKethan v. Mantello*, 292 F.3d 119, 122 (2d Cir. 2002)); *see also Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir. 1994). However, "[a] district court also may . . . deny a petition on the merits even if it contains an unexhausted claim." *Id.* at 1197; *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Courts in this Circuit generally exercise their discretion to reach the merits where an unexhausted claim is "patently frivolous." *See Johnson v. Colvin*, 2018 WL 6250510, at *6 (E.D.N.Y. Nov. 29, 2018); *see also Naranjo v. Filion*, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003) (collecting cases). Further, a "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines v. Weber*, 544 U.S. 269, 277 (2005). "[E]ven if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Id.* This Court, in its discretion, addresses the merits of the ineffective assistance of counsel claim.

### B.    Cause and Prejudice or Actual Innocence

For those claims that are procedurally defaulted, Petitioner cannot show cause and prejudice or actual innocence.[7] "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first

---

[7] These claims concern the the failure to implement a mental health evaluation, his Fourteenth Amendment challenge to the deadlocked jury instruction, whether his conviction was against the weight of the evidence, and that the introduction of identification testimony based on an unpreserved photo array violated his due process rights.

demonstrate either cause and actual prejudice or that he is actually innocent." *Bousley*, 523 U.S. at 622; *Murray*, 477 U.S. at 485, 496; *see also United States v. Frady*, 456 U.S. 152, 165 (1982) ("[A] collateral challenge may not do service for an appeal.").

### 1.     Cause and Prejudice

Petitioner has not made a showing of cause and prejudice for the default on his four claims: (1) that his conviction was against the weight of the evidence, (2) that the introduction of identification testimony based on an unpreserved photo array violated his due process rights, (3) that the district court erroneously failed to conduct a mental health evaluation, and (4) that the deadlocked jury instruction violated the Fourteenth Amendment.  The record and evidence provided a basis for making all of these claims before the Appellate Division and the Court of Appeals.  Petitioner also has not shown—in light of the Court's determination that none of these claims have any merit—that prejudice will result from this Court failing to consider the defaulted claims.

### 2.     Actual Innocence

Petitioner also has not made a gateway showing of "actual innocence" to excuse his procedural default.  Construing Petitioner's briefs to raise the strongest arguments that they may suggest, Petitioner plausibly alleges a claim of actual innocence by arguing that the officers made him change into clothes that would identify him as the perpetrator.[8]  A claim of actual

---

[8] That evidence was not "fairly presented" to the Court of Appeals as a constitutional argument and thus petitioner must show "cause and prejudice" or "actual innocence."  Although Petitioner mentioned in his brief to the Appellate Division, in support of his claim challenging the weight of the evidence, that the description of what Mr. Smith was wearing differed from the Arrest Report, Dkt. No. 25-6 at 4, he only briefly asserted this point in a footnote in a section describing the "Factual and Procedural Background" in his letter seeking leave to appeal to the Court of Appeals.  Dkt. No. 25-9 at 3 n.2.  That is insufficient to fairly present such a claim to the Court of Appeals.  *See Guerrero v. Tracey*, 425 F. Supp. 2d 434, 444 (S.D.N.Y. 2006) ("Although petitioner notes that the [claim] was mentioned in a footnote . . . in his leave application to the New York Court of Appeals, the mere reference to that event as part of a procedural account of

innocence, however, must be both "credible" and "compelling."  For the claim to be "credible," it must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.  For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'"  *Rivas*, 687 F.3d at 541 (citation omitted).

Petitioner's claim is not compelling in light of the significant circumstantial evidence tying Petitioner to the shooting.  At best, the evidence introduces inconsistencies between the 911 call describing the shooter, the photos taken of Petitioner at his residence, and a portion of Sidney's testimony.  But these inconsistences do not suffice to show that "no reasonable juror would have found guilt beyond a reasonable doubt."  *Cf. House*, 547 U.S. at 541 (finding that DNA evidence showing that petitioner was not source of semen on victim was "compelling" because it rebutted "a central theme in the State's narrative linking House to the crime," which was that the petitioner's motive for the murder was sexual assault).  Irrespective of whether his clothes matched the 911 call, Tamekia and Sidney provided eyewitness testimony that they witnessed Petitioner call someone requesting a gun; that he was in an excited, angry, and confrontational state; that he left the scene and subsequently returned after making the call for the gun; that he was crouching over and pulled out a gun from his sock and pointed it at Sidney; that he subsequently chased Yusef; that they heard gunshots immediately after he chased Yusef;

---

prior proceedings in this case is not equivalent to making a constitutional argument about the misidentification."); *see also Strogov v. Attorney General of State of N.Y.*, 191 F.3d 188, 193 (2d Cir. 2001) (federal claim not fairly presented where state case employing constitutional analysis was cited to state court in footnote to section of petitioner's brief arguing state law claim).

and that they saw him trailing Yusef, now shot, into the building, before fleeing from the building.  That account was displayed to the jury through video evidence.  Ballistics evidence also corroborated the story of Tamekia and Sidney.  Petitioner has not shown that his "newly discovered evidence" is compelling.  *See*, *e.g.*, *Philbert v. Brown*, 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012) (rejecting sworn affidavit of Petitioner's girlfriend providing an alibi in light of contradictory eyewitness testimony identifying petitioner as the assailant); *Lawrence v. Greene*, 2011 WL 1327128, at *7 (E.D.N.Y. Mar. 31, 2011) (similar); *see also Diaz v. Bellnier*, 974 F. Supp. 2d 136, 145 (E.D.N.Y. 2013) (stating that while new evidence did introduce "additional inconsistencies between the statements of testifying witnesses, the physical evidence from the crime scene, and the confessions of Petitioner and his co-defendant, and highlights the absence of evidence," a "far more robust showing of innocence is required").

Accordingly, this Court dismisses Petitioner's claims based on the *Allen* charge, the failure to conduct a mental competency examination, identification based on the photo array, the sufficiency of the evidence, and any extant claim of actual innocence, on the basis of procedural default.

## III.    The Procedurally Defaulted Claims are Meritless

Even if Petitioner had properly raised his claims in state court, the Court would be compelled to deny his request for relief on the basis of the merits.  The Court may consider these claims for the purpose of denying them on the merits.  *See* 28 U.S.C. § 2254(b)(2).

### A.    The *Allen* Charge

Petitioner objects to the trial court's *Allen* charge.  In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court approved an instruction given by a trial court urging a jury to reach a unanimous verdict.  The trial court told the jury:

that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if the much larger number were for a conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Id.* at 501.

In short, in giving an *Allen* charge, the trial court must urge the jury, "to continue deliberating and for the jurors in the minority to listen to the majority's arguments and ask themselves whether their own views were reasonable under the circumstances." *Spears v. Greiner*, 459 F.3d 200, 204 (2d Cir. 2006). In addition, "when an *Allen* charge directs jurors to consider the views of other jurors, specific cautionary language reminding jurors not to abandon their own conscientious beliefs is generally required." *Id.* at 205 (citations omitted).

Trial courts must take care that any *Allen* charge is not impermissibly coercive. The Second Circuit has held that a deadlock charge may violate a defendant's due process rights when "it *both* (1) obligated jurors to convince one another that one view was superior to another, *and* (2) failed to remind those jurors not to relinquish their own conscientiously held beliefs." *Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999) (emphasis added); *see also United States v. Robinson*, 560 F.2d 507, 517 (2d Cir.1977) (en banc) ("The propriety of an *Allen*-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts.").

The trial court's *Allen* charge was proper, and not impermissibly coercive. The trial court, in its charge to the jury, encouraged the jurors to continue deliberating in good faith, to

28

keep trying to arrive at a unanimous verdict, and reminded them that "[t]here's no reason to believe that the presentation of this case again to another jury will be to a jury anymore [sic] intelligence, reasonable, hardworking or fair than you." Dkt. No. 26 at 642–44.  The trial court also included the necessary cautionary language:

> I want to emphasize that I am not asking any juror to violate his or her [conscience] or to abandon his or her best judgment.  Any verdict you reach must be the verdict of each juror and mere acquiescence in the conclusion of others is not what we are asking you to do.  But I am asking you to continue deliberating and to resume your deliberations with an open mind.  Start with a fresh slate if you are so inclined.  Don't feel bound by how you felt before whether you voted conviction or whether you voted for acquittal.  Have the courage to be flexible.

*Id*. at 644.

The language was balanced.  It made clear that each juror should be flexible whether she voted for conviction or voted for acquittal.  The trial court did not impose an obligation on "jurors to convince one another that one view was superior to another," or fail "to remind those jurors not to relinquish their own conscientiously held beliefs."  *Smalls*, 191 F.3d at 278.  The trial court was explicit in not steering the jury towards a particular verdict or encouraging jurors to abandon their sincerely held beliefs about the case.

Accordingly, the trial court's *Allen* charge was not contrary to, or an unreasonable application of, clearly established federal law.[9]

### B.     The Mental Health Evaluation

Petitioner also argues that he "was suppose[d] to [receive] a mental health evaluation before any further proceeding was to proce[ed] during trial court."  Dkt. 5 at 14.  The Supreme

---

[9] The Court further notes that Petitioner's attorney requested the *Allen* charge, and the judge gave the deadlock charge to the jury over the objections of the prosecution.  Dkt. No. 26 at 638–41.  To the extent counsel for the defense requested the *Allen* charge, or did not object to it, Petitioner's objection would be most cognizable as an ineffective assistance of counsel claim.  Petitioner has not raised this claim on direct appeal, and it is accordingly deemed procedurally defaulted.  *See Speringo v. McLaughlin*, 202 F. Supp. 2d 178, 188–89 (S.D.N.Y. 2002).

Court has recognized that the criminal trial of an incompetent person violates the Due Process Clause of the Fourteenth Amendment. *See Medina v. California*, 505 U.S. 437, 453 (1992) (citing cases). A criminal defendant is fit to stand trial when he "has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993); *see also Dusky v. United States*, 362 U.S. 402, 402 (1960) (defining competency as "sufficient present ability to consult with [one's] lawyer with a reasonable degree of rational understanding [including] a rational as well as factual understanding of the proceedings."). "[I]n the event a sufficient doubt exists," due process demands that the trial court conduct an inquiry into the defendant's competence. *Smith v. Rock*, 554 F. Supp. 2d 505, 519 (S.D.N.Y. 2008), *aff'd*, 344 F. App'x 656 (2d Cir. 2009).

There is nothing in the record to suggest that Petitioner was not mentally fit to stand trial, or that a mental competency evaluation should have been requested. From the record, the trial court had ample opportunity to observe Petitioner. There is no basis to believe that "sufficient doubt" existed. Petitioner demonstrated the requisite "capacity to understand the proceedings and to assist counsel" required by law to show fitness to stand trial. *Godinez*, 509 U.S. at 402. In addition, that Petitioner's trial counsel did not request a competency evaluation "provides substantial evidence of the [Petitioner's] competence" to stand trial. *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986).

### C.    The Identification Procedure

Petitioner further argues that the procedure used to identify him at the police precinct was unduly suggestive. "Reliability is the touchstone for the admission of eyewitness identification testimony pursuant to the Due Process Clause of the Fourteenth Amendment." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). In reviewing due process challenges to the admissibility of identification testimony, courts employ a two-part test. The first step is whether the

identification procedures were "unduly suggestive of the suspect's guilt" in light of the totality of the circumstances, and the particular facts of each case. *United States v. Muhanad Mahmoud Al-Farekh*, 956 F.3d 99, 110–11 (2d Cir. 2020) (citing *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990)). "[A]n identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create 'a very substantial likelihood of irreparable misidentification.'" *Brisco*, 565 F.3d at 88 (quoting *Simmons v. United States,* 390 U.S. 377, 384 (1972)).

If the identification procedures are unduly suggestive, courts move onto the second step of the inquiry to "consider whether the 'in-court identification' is 'independently reliable rather than the product of the earlier suggestive procedures.'" *Id.* If the in-court identification is independently reliable, identification testimony could still be admissible even if the out-of-court procedures were unduly suggestive. The factors to be considered in determining whether identification testimony is reliable are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *see also Brisco*, 565 F.3d at 89 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114. "The ultimate questions are whether the pretrial proceedings have been conducted in a manner that was unnecessarily suggestive and whether, in all the circumstances, there is 'a very substantial likelihood of irreparable misidentification.'" *Maldonado-Rivera*, 922 F.2d at 973 (quoting *Simmons,* 390 U.S. at 384).

Recently, in *Al-Farekh*, 956 F.3d 99, the Second Circuit elaborated on some of the factors that courts should consider in evaluating whether a pretrial identification procedure involving "photographic presentations" is unduly suggestive.  While making clear that "there is no bright-line rule that can be applied to determine whether an identification procedure is unduly suggestive," the Second Circuit identified three forms that unduly suggestive identification procedures may take: "(1) a very small number of photographs, which are in turn presented in a manner that suggests to the witness that a specific person may be the suspect . . . ; (2) a large number of photographs depicting the same person . . . ; or (3) the utterance of suggestive comments by interrogators to the witness to obtain an identification that is jointly constructed by supplying the witness with previously unknown facts about the suspect . . . ."  *Id.* at 111–12 (citations omitted).

In *Al-Farekh*, the defendant was identified by a witness who had seen him on two occasions.  The identifying witness in *Al-Farekh* identified a photograph of the defendant out of an array of roughly three hundred photographs after providing investigators with a description of the defendant and helping investigators to compose a sketch of the defendant.  *Id*. at 112.  The witness expressed "'100 percent' confidence in his identification," and wrote a statement confirming the identification on the back of a photograph depicting the defendant.  *Id.*  The Second Circuit held that "where, as here, there is a large display of photos arranged in no particular order or format, and the interrogators do not intimate which picture the witness should identify, the identification procedure is not impermissibly suggestive."  *Id.*

In light of those principles, the procedure used to identify Petitioner here was not unduly suggestive.  Tamekia, accompanied by her sister Annanetta, went to the police precinct the morning after the shooting had taken place, and she told Detective Narvaez that "Ozzie" had shot

her cousin Yusef.  Dkt. 26-1 at 11.  She "knew him for several years" and "saw him earlier that evening" and "knew him from the old neighborhood" of the "west side, Bronx."  *Id.* at 16, 23. Detective Narvaez showed Tamekia between ten and fifteen photographs, none of which she identified as Petitioner.  *Id*. at 14.  After Annanetta gave the police the last name "Smith," and Detective Narvaez added the name to the database, Tamekia was able to make a positive identification: "[T]hat's him, that's Ozzie."  *Id*. at 13–14.  Tamekia then signed and dated a printed copy of the photo of Petitioner, and wrote on the photo, "That the man that shot my cousin Yusfe [sic]."  *Id*. at 14; Dkt. 25-5 at 2.

Detective Narvaez did not show Tamekia "a very small number of photographs . . . presented in a manner that suggests to the witness that a specific person may be the suspect," or "a large number of photographs depicting the same person."  *Al-Farekh*, 956 F.3d at 111–12. Nor is there evidence to suggest Detective Narvaez, or anyone else at the precinct, made any suggestive comments to encourage identification of Petitioner as the shooter.  Tamekia identified Petitioner from "a large display of photos arranged in no particular order or format" based on her knowing him for years and having seen him earlier that night.  *Id.*  The Appellate Division reasonably held that Petitioner's claim that the photo array was unduly suggestive was "without merit" because "[t]he witness knew defendant for several years and gave the police a shortened form of his first name. . . .  The use of photographs was solely for the purpose of finding the person the witness had already named."  *Smith*, 102 N.Y.S.3d at 569; *cf. de la Cruz v. Kelly*, 1990 WL 155700, at *7 (S.D.N.Y. Oct. 10, 1990) (noting an exception under New York law for pretrial notice of identification evidence when "where the witness and the defendant were previously acquainted with one another" and "the use of the photographic arrays were more in the nature of a confirmation rather than an identification")

Accordingly, the state appellate court decision was not contrary to, or an unreasonable application of, clearly established federal law.

### D.  Sufficiency of the Evidence

Finally, Petitioner argues that his conviction was against the weight of the evidence, and specifically that Tamekia and Sidney were not credible witnesses.  At the outset, weight of the evidence claims are not cognizable on habeas appeal.  "A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)," as opposed to "a legal sufficiency claim" which "is based on federal due process principles." *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).  Moreover, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

The Court construes Petitioner's *pro se* application liberally to raise the "strongest [claims] that they suggest." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks and citations omitted).  The strongest claim would be one that sounds in sufficiency of the evidence.  The Due Process Clause of the Fourteenth Amendment protects a defendant from conviction of a crime unless there is proof beyond a reasonable doubt of every fact necessary to constitute the crime with which the defendant has been charged.  *See Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  When challenging a state conviction pursuant to 28 U.S.C. § 2254, a petitioner will be "entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *accord Farrington v. Senkowski*, 214 F.3d 237, 240–41 (2d Cir. 2000).  Sufficiency of the evidence review is "a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a meaningful opportunity to defend against the charge against him and a jury finding of guilt beyond a

34

reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (citations and internal quotations omitted).

A petitioner must clear a very high bar in challenging the sufficiency of the evidence used to secure his conviction.  The Supreme Court has stated that "a state prisoner must show that the state court's ruling on the claim being presented in federal court [on habeas review] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The Supreme Court has called the standard "twice-deferential."  *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  The first level of deference is to the jury: "We have said that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Id.* (citations and internal quotations omitted).  The second level of deference is to the state court: "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable."  *Id.* (citations and internal quotations omitted).  The Second Circuit has further clarified that "to permit habeas relief under the 'unreasonable application' phrase, a state court decision must be not only erroneous but also unreasonable.  Some increment of incorrectness beyond error is required."  *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).  Finally, "a federal habeas corpus court faced with a record . . . that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Jackson* 443 U.S. at 326.

When considering a legal-insufficiency argument, "[a] federal court must look to state law to determine the elements of the crime."  *Fama* 235 F.3d at 811 (alteration in original) (citation omitted).  Federal courts must consider whether "there was sufficient evidence for a

jury to find that the prosecution proved the substantive elements of the crime as defined by state law." *Einaugler v. Supreme Court of State of New York*, 109 F.3d 836, 839 (2d Cir.1997) (citations omitted); *accord United States v. Rodriguez*, 68 Fed. App'x. 237, 240 (2d Cir. 2003). The Court considers whether a jury "could" reach its conclusion and is limited to the material that was presented at trial. *See Rivas*, 687 F.3d at 542 (comparing the standard for a gateway showing of actual innocence with a claim of insufficient evidence).

The charge at issue in this case is denominated Murder in the Second Degree. Under NYPL § 125.25(1), a person is guilty of this crime when:

> With intent to cause the death of another person, he causes the death of such person or of a third person[.]

NYPL § 125.25(1)

Petitioner's claim, liberally construed, is that the evidence did not permit the jury to find that he intended to cause the death of Yusef or that he did in fact cause the death of Yusef. Applying the deferential standard detailed above, the Court cannot conclude that the evidence failed to meet the *Harrington* standard.

At trial, the prosecution produced substantial evidence of Petitioner's guilt. Tamekia, Yusef's cousin, testified that she saw Petitioner quarreling with Yusef and others at 1030 Boynton Avenue, heard him make a phone call asking for a gun before leaving the block, and saw him return with a gun in an ankle holster. Dkt. No. 26 at 63–64, 78, 84–85. She further testified that she saw Petitioner kneel down, remove a gun from his ankle, and pursue Yusef behind a van, where he fired two shots. *Id*. at 67–69. She also testified that she saw Petitioner follow Yusef into the building after the latter had been shot. *Id*.

Sidney, Yusef's cousin and Tamekia's brother, also testified that Petitioner had been quarreling with others outside 1030 Boynton Avenue and that he asked Petitioner to leave the

area. *Id*. at 221–23.  He corroborated Tamekia's account of Petitioner making several phone

calls, although he could not hear what Petitioner said to the person on the other line, and he

testified that Petitioner returned to 1030 Boynton Avenue with a .38 revolver and said, "Why

y'all tried to play me?"  *Id*. at 230–34.  He further testified that Yusef tried to reach for

Petitioner's pocket, and Petitioner then "pull[ed] out a gun and" "pointed it at" Sidney.  *Id*. at

231.  Petitioner looked at Yusef, and when he did, Sidney ran into the building.  *Id*. at 231.

Sidney then testified that he heard two shots, followed by Yusef yelling, "I'm hit," and

collapsing on the steps in the apartment building.  *Id.* at 232–33.

The jury heard further testimony from: Officer Sean Sterling and Officer Pavel Santos,

who responded to the scene of the shooting, *id*. at 4–18, 202–06; Detective Anthony Ribustello,

who documented and collected forensic evidence at the scene, *id*. at 33–52; Detective Narvaez,

who investigated the shooting, learned Petitioner's identity from Tamekia, and arrested

Petitioner at his apartment, *id*. at 325–36; Dr. Christine Landi, an expert in forensic pathology,

who performed the autopsy of Yusef, *id.* at 372–82; and Detective Rodney Rodriguez, a

ballistics expert in microscopic examination, who determined that a bullet removed from Yusef's

body came from a .38 revolver which can be kept on an ankle holster, *id*. at 314–19.  Combined

with the lay eyewitness testimony that Petitioner had a .38 revolver in an ankle holster, that he

pulled out the firearm and pursued Yusef with it, and that immediately following the pursuit

shots were heard and Yusef collapsed on the apartment building steps saying that he had been

hit, this testimony powerfully confirmed Petitioner's guilt.

In addition to this extensive testimony, the prosecution played for the jury surveillance

footage of the outside of 1030 Boynton Avenue from several angles around the time of the

shooting, that corroborated the testimony and showed Petitioner confronting Sidney and pursuing

Yusef around a van.  *See*, *e.g.*, *id*. at 79–91, 177–81, 246–47.[10]

The defense did not offer evidence of its own.

Given the extensive evidence offered by the prosecution, Petitioner has not established that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.  Upon the evidence, Petitioner had been quarreling with the victim prior to the shooting; left the scene after calling for a firearm; returned to the scene to confront the victim; and ultimately pursued the victim and fired shots that caused the death of the victim. A reasonable jury could have found that the prosecution proved beyond a reasonable doubt that Petitioner intended to cause, and did cause, the death of Yusef Middleton.  The record does not establish that there was error at the trial level, much less the increment beyond error the law requires for Petitioner to prevail on a sufficiency of the evidence claim.

Accordingly, Petitioner's claim that the evidence was insufficient to support his conviction of second-degree murder is dismissed.

## IV.    The Other Exhausted Claims Are Meritless

Petitioner raised his claims that his due process rights were violated by denial of the motion to unseal Yusef's arrest records and by admission of the 911 calls in state court proceedings including to the New York Court of Appeals.  Accordingly, he has exhausted the legal remedies available to him for these claims in the state courts.  The claims, however, are meritless.

---

[10] The prosecution also introduced into evidence and played for the jury the two 911 calls made immediately after the shooting of Yusef, one made by Tamekia, the other made by an unknown caller describing the shooter.  Dkt. No. 26 at 361–63, 383–85.  Shery-Ann Brown, a 911 technician with the Communications Division of the NYPD, gave testimony on how 911 calls are recorded, cataloged, and reproduced.  *Id*. at 387–88.

A.      **Denial of Petitioner's Motion to Unseal Yusef's Arrest Records**

Before trial, Petitioner moved for *in camera* review of arrest records and a complaint involving Yusef, alleging that Yusef had been charged with assault. Dkt. 26-1 at 2–3, 58–60. Counsel for Petitioner obtained information about the assault charge from a complaint follow-up report in the case below. *Id.* at 59–60. Petitioner moved to unseal the records regarding Yusef's arrests. Justice Robert Torres denied the motion, stating following his review of the records, "I don't think there is anything there that goes to the relevant issue that would be before this jury." Dkt. 26-2 at 233. At sentencing, counsel for Petitioner referenced these materials and theorized that the other individual, or individuals, involved in Yusef's alleged assault incidents "might be interested in doing harm to Yusef." Dkt. 26-3 at 10. Petitioner later appealed the decision not to unseal Yusef Middleton's arrest records to the Appellate Division, advancing federal and state constitutional arguments that he was deprived of his right to present a defense. Dkt. 25-6 at 44–46.

The Supreme Court has recognized the right of criminal defendants to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The Court has also held that state evidentiary rules should not be applied rigidly to exclude the presentation of evidence of third-party culpability. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Defendants have the right "to put before a jury evidence that might influence the determination of guilt." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). That may include "any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (citation omitted).

This right is, however, subject to "reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "A defendant's interest in presenting such evidence may thus 'bow to

accommodate other legitimate interests in the criminal trial process.'"  *Id.* (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)).  State courts may exclude evidence when evidentiary rules "designed to assure both fairness and reliability in the ascertainment of guilt and innocence" require their doing so.  *Chambers*, 410 U.S. at 302; *see also Taylor*, 484 U.S. at 410.

The Second Circuit has considered the "determinative question" in ascertaining whether the exclusion of evidence violates a defendant's right to present a complete defense to be "whether the omitted evidence would have created reasonable doubt."  *See Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003) (citing *Justice v. Hoke*, 90 F.3d 43 (2d Cir. 1996)).  In *Wade*, the Second Circuit weighed the "limited probative value of the proffered testimony" against the risk that "the jury could have been misled or confused by the testimony."  *Id.* at 61.  As to evidence that purports to establish a third party was responsible for the offense charged in that case, the Second Circuit expressed "serious concerns" that "[t]he potential for speculation into theories of third-party culpability [may] open the door to tangential testimony."  *Id.*

Evidence of third-party culpability must "sufficiently connect the other person to the crime."  *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (citing *Holmes*, 547 U.S. at 327).  As one district court has distilled the Second Circuit's approach: "Whether excluding alternative perpetrator evidence would deprive a defendant of a fair trial depends on the strength of the nexus between the charged crime and third party whom the defendant seeks to implicate."  *United States v. Gilmore*, 2021 WL 4151009, at *2 (S.D.N.Y. Sept. 13, 2021).  The existence of a nexus between the charged crime and the third party must be based on more than speculation by the defendant.  *See, e.g.*, *United States v. Wade*, 512 F. App'x. 11, 13–14 (2d Cir. 2013) (finding no temporal or physical link between third party's arrest and charged crime); *Padilla v. Artuz*, 2010 WL 8971502, at *8 (S.D.N.Y. Nov. 18, 2010) ("Petitioner offers nothing more than

his own speculation as to the content of Ellis's sealed record."); *cf. Gilmore*, 2021 WL 4151009, at *4 ("Thus the theory linking Individual-1 to the Charged Robberies does not rely on unsupported speculation or a 'brittle chain of inferences.'" (citation omitted)).

The Appellate Division found that the lower court "providently exercised its discretion in denying defendant's request for sealed records of the deceased's arrest for assault." *Smith*, 102 N.Y.S.3d at 569.  In doing so, the appeals court considered "[Petitioner's] claim that those sealed records contained information relevant or helpful to his defense" and determined that the claim was "based on speculation."  *Id.* (citation omitted).  The court relied on *People v. Gamble*, 18 N.Y.3d 386 (N.Y. 2012), in which the New York Court of Appeals upheld a trial court's exclusion of evidence purported to implicate a third party.  In *Gamble*, the Court of Appeals found that the defendant had "failed to establish a nexus" between an earlier assault in which the victim was involved, and the charged crime.  *Id.* at 398–99 (citing *People v. Primo*, 753 N.E.2d 164, 168–69 (N.Y. 2001)).

The Appellate Division's decision was not contrary to, or an unreasonable application of, clearly established federal law.  The state appeals court recognized Petitioner's right to present a complete defense and considered whether the exclusion of evidence purporting to show third-party culpability infringed on that right.  In reliance on state court precedent that closely tracks the precedent in the Second Circuit, the state appeals court held that the trial court had not abused its discretion in denying Petitioner's motion.  The state appeals court found that Petitioner's contention that Yusef's arrest record would provide evidence of third-party culpability was merely speculative, and therefore insufficient to show a nexus between some other party and crime charged.  The observation that Yusef may have had interpersonal conflicts with other individuals in the months leading up to his murder does not implicate these

individuals in his murder.  Petitioner has not furnished any basis for this Court to find that the

omitted evidence would have created a reasonable doubt and has not established the "increment

of incorrectness beyond error" that is necessary to obtain habeas relief.  *Sorto*, 497 F.3d at 169.[11]

### B. The Admission of the Two 911 Calls

At trial, the court also admitted the two 911 calls made shortly after Yusef was shot—the

call by Tamekia and the second call from the unidentified caller who described the shooter as

wearing black and red.  Dkt. No. 26 at 114, 384–85.  The prosecution offered the calls under the

excited utterance exception to the rule against hearsay.  *Id*. at 119–20.  Counsel for the defense

opposed the admission of the second call on the grounds that the caller was not in "an excited or

panic [sic] state."  *Id*. at 361.

In his appeal to the Appellate Division, Petitioner argued that the admission of the 911

calls violated Petitioner's right to a fair trial, because their admission "contravened the rule

against hearsay, and the state and federal constitutions."  Dkt. 25-6 at 37.

The Supreme Court has held that "it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions.  In conducting habeas review, a

---

[11] Alternatively, this argument could be construed as a *Brady* claim, in which the State withheld evidence under its control favorable to the accused.  *See generally Brady v. Maryland*, 373 U.S. 83 (1963).  "Violation of that constitutional duty warrants a new trial . . . where the Government has (1) failed to disclose (2) material evidence that was (3) favorable to the accused.  The defendant must establish all three prongs of the test-favorable evidence, suppression and materiality-before there is any *Brady* violation."  *Hughes v. Phillips*, 457 F. Supp. 2d 343, 359 (S.D.N.Y. 2006) (citing *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001)).  That argument, however, has no merit.  "It is well established that the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief."  *Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (citing *Strickler v. Greene*, 527 U.S. 263, 286 (1999)).  Petitioner has failed to "proffer . . . any nonspeculative basis" that the government withheld exculpatory evidence.  *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998).  Again, even if Yusef had a previous arrest charge for assault, it is entirely speculative that there was an individual with interpersonal conflicts who would have decided to shoot Yusef that night.  Petitioner has not shown the presence of a *Brady* violation.

federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  As one federal appeals court has formulated the standard for considering a challenge to the admission of evidence in a state trial on habeas review, "[t]he only question . . . is whether the trial court's failure to exclude evidence rendered the trial so fundamentally unfair as to violate due process." *Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir. 2008) (citation and internal quotations omitted).

The Sixth Amendment to the U.S. Constitution guarantees that defendants in criminal cases have the right to confront witnesses against them.  An out-of-court statement admitted to prove the truth of the matter asserted in the statement constitutes hearsay.  Fed. R. Evid. 801(b).  However, under the excited utterance exception to the rule against hearsay, "statement[s] relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" are not hearsay.  Fed. R. Evid. 803(2).  The reasoning behind this exception, as formulated by the Supreme Court, is that "the declarant, in the excitement, presumably cannot form a falsehood."  *Michigan v. Bryant*, 562 U.S. 344, 361 (2011).

The Sixth Amendment bars the admission of "testimonial" out-of-court statements in most cases, unless the declarant is made available for cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 50-52 (2004).  The Court provided several examples of types of testimonial statements, including "[s]tatements taken by police officers in the course of interrogations."  *Id.* at 52.  In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  *Id.* at 822.  If there is no ongoing emergency,

and the chief purpose of the interrogation is to "establish or prove past events potentially relevant to later criminal prosecution," the statements are considered testimonial, and implicate the Confrontation Clause.  Like the justification for the excited utterance exception, *Davis* stands for the proposition that "the prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished."  *Bryant*, 562 U.S. at 361.

The Second Circuit has explained that the examples of testimonial statements included in *Crawford* are no "more than a set of guideposts [for] courts [to] work through, case-by-case . . . ."  *United States v. Burden*, 600 F.3d 204 (2d Cir. 2010).  In *United States v. James*, 712 F.3d 79 (2d. Cir. 2013), the Second Circuit found that a "routine" autopsy report was not testimonial.  *Id.* at 97–99.  The dispositive question, the court held, was "whether, under the circumstances, the autopsy report . . . was prepared with the primary purpose of creating a record for use at a later criminal trial."  *Id.* at 97.

In evaluating whether 911 calls made during or shortly after an emergency were properly admitted as evidence, courts have looked to the factors outlined by the Supreme Court in *Davis*, in particular, whether the purpose of a call was "to enable police assistance to meet an ongoing emergency."  *Davis*, 547 U.S. at 828.  When the primary purpose of a 911 call is to resolve an existing emergency, rather than establish evidence for a future prosecution, courts have consistently found those calls non-testimonial in nature and constitutionally admissible.  *See, e.g.*, *Rivera v. Collado*, 2021 WL 603047, at *11 (S.D.N.Y. Feb. 16, 2021) (call made promptly after slashing attack); *United States v. Scott*, 2014 WL 6765960, at *2 (S.D.N.Y. Nov. 28, 2014) (call made while defendant was walking around housing complex with a firearm); *Rodriguez v. Lee*, 2011 WL 1362116, at *8 (S.D.N.Y. Feb. 22, 2011) (call made during ongoing chase in immediate aftermath of robbery).

44

The Appellate Division found that the trial court "properly admitted two 911 calls as excited utterances" and that "it was inferable from the circumstances that the callers had the opportunity to observe personally what they described to the 911 operator." *Smith*, 102 N.Y.S.3d at 569. In support of its holding, the Appellate Division cited to *People v. Cummings*, 99 N.E.3d 877, 881–82 (N.Y. 2018), which restated the excited utterance exception to the rule against hearsay. The court's findings were tantamount to a conclusion that the statements were nontestimonial. That conclusion was not contrary to, or an unreasonable application of, clearly established federal law.

Both calls were made in the immediate aftermath of a fatal shooting for the purpose of rendering emergency assistance to the victim.[12] Tamekia told the operator about the situation, and included the address for the purpose of dispatching an ambulance: "I need an ambulance at 1030 Boynton. . . . My cousin just got shot. Please. . . . 1030 Boynton . . . on the second floor please." Dkt. 25-1 at 5. The purpose of the call was not to create a record for later use in a criminal proceeding, but to respond to the ongoing emergency and is accordingly not testimonial.

The second caller similarly told the operator the address where the shooting occurred, communicated the gravity of the medical emergency, and asked for an ambulance. He told the operator that the victim was a male who had been shot in the stomach at 1030 Boynton Avenue, adding that, "It's like he's dying right now." *Id.* The caller told the operator that the shooter was "[a] black guy" wearing "[a]ll black, black and red," and requested an ambulance an additional time before hanging up. *Id.* at 6. The call was not testimonial because the primary purpose of

---

[12] Petitioner argues that the 911 calls did not sound excited or panicked. However, initial reactions to trauma vary widely, and can include exhaustion, confusion, agitation, numbness, and disassociation. "Understanding the Impact of Trauma – Trauma-Informed Care in Behavioral Health Services," *Center for Substance Abuse Treatment* (2014), https://www.ncbi.nlm.nih.gov/books/NBK207191/.

the 911 operator's questions was to get help to Yusef as quickly as possible.  Accordingly, the

caller provided vital information as to the location of the shooting, the location of the victim, and

the extent of the victim's injuries.  The caller's description of the perpetrator's clothing was

similarly offered for the purpose of resolving the exigent emergency, specifically assisting police

in apprehending the shooter as quickly as possible.  It is therefore also not testimonial.

**V.      The Ineffective Assistance of Counsel Claim Is Meritless**

Petitioner also argues that his trial attorney provided ineffective assistance of counsel.

Dkt. No. 9.  When challenging the effectiveness of counsel's assistance, a petitioner must

demonstrate both of the prongs set forth in *Strickland v. Washington,* 466 U.S. 668 (1984): (1)

that counsel's representation "fell below an objective standard of reasonableness" measured

against "prevailing professional norms" and (2) that this "deficient performance prejudiced the

defense," with such prejudice defined as "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Id*. at 687–88.

Petitioner's unexhausted ineffective assistance of counsel claim has no merit.  Petitioner

claims that his attorney should have requested a mental health evaluation to determine his

"ability to stand trial."  Dkt. No. 9 at ECF p. 3.  Petitioner provides mental health records from a

psychiatric facility indicating that he suffers from "depression, insomnia, anhedonia and suicidal

ideation."  *Id*. at ECF p. 6.  Those forms are from 2007 and 2008, approximately four years

before the event in question and about seven to eight years before his trial in 2015.  *Id*.  He

submits one form from 2015 for the provision of "court meds" which described him as "alert and

oriented" and outlined his current medications.  *Id*. at ECF p. 10.  He claims his "sister provided

relevant information to [his] trial court lawyer in regards to [his] mental health status."  *Id.*

Those reports do not show that he was incompetent to stand trial.  As previously noted, a

criminal defendant is fit to stand trial when he "has the capacity to understand the proceedings

and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).  Further, "[i]t is well-established that some degree of mental illness cannot be equated with incompetence to stand trial."  *Vamos*, 797 F.2d at 1150; *see id*. (finding that report providing that one "suffering from depression . . . did not address issues bearing on ability to confer with counsel and to assist in the preparation of a defense" because the report didn't "link . . . illness to her competency to stand trial"); *see also Perez v. United States*, 2017 WL 1628902, at *5 (S.D.N.Y. May 1, 2017) ("Depression, suicidal ideation, or even a suicide attempt, by themselves, do not constitute incompetence.").  Rather, Petitioner must specifically "link" his mental illness to an inability to stand trial.  *Vamos*, 797 F.2d at 1151.  Even "[t]reatment with antipsychotic drugs does not per se render a defendant incompetent to stand trial."  *Gluzman v. United States*, 124 F. Supp. 2d 171, 176 (S.D.N.Y. 2000) (B.D. Parker, J.) (quoting *Vogt v. United States*, 88 F.3d 587, 591 (8th Cir. 1996)).  Insofar that the reports indicate a potential for dangerousness, "[d]oubts about a defendant's mental health and dangerousness are not equivalent to doubts about his competency to stand trial."  *Williams v. Coughlin*, 664 F. Supp. 665, 667 (E.D.N.Y. 1987).  Here, Petitioner "does not claim and has never claimed that [h]e was unable to perceive, to cogitate, to communicate with counsel, or that she lacked the ability to understand the nature of the proceedings."  *Gluzman*, 124 F. Supp. 2d at 175.  In addition, most of his materials do not pertain to his mental status around the time of trial.  *See Vamos,* 797 F.2d at 1150 ("The question of competency to stand trial is limited to the defendant's abilities at the time of trial.").  Petitioner simply has not proffered record materials that would show that a request from his counsel to hold a mental health evaluation would show that he would be incompetent to stand trial.  *See Williams*, 664 F. Supp. at 667 (stating that such evidence "include[s] prior medical opinions on

*his competence to stand trial or plead guilty*, his demeanor in court, and his irrational behavior" (emphasis added)).

Furthermore, the "failure to conduct a full competency hearing is not a ground for reversal when the defendant appears competent during trial." *Vam*os, 797 F.2d at 1150. The record shows that Petitioner was competent to stand trial, as shown by several instances in which he engaged with the court, consulted with his attorney, and exhibited an overall demeanor of competence. *Williams*, 664 F. Supp. at 667. At the earlier evidentiary hearing, he confirmed, in accordance with the assertion of his attorney, that "he's not interested in any disposition" or any pleas. Dkt. No. 26-1 at 6. That also comported with his history, as described by State counsel, that he "doesn't really consider pleas on cases." *Id*. at 5–6. During the trial itself, he affirmed that he did not wish to testify despite his attorney advising him that he had a right to do so. Dkt. No. 26 at 397. Later, he affirmed during his sentencing to the court that he had consulted with his attorney that he wanted to plead guilty to the disorderly conduct charge. Dkt. No. 26-3 at 3. He affirmed "Yes, sir," that it was what [he] want[ed] to do" and that no one was forcing him to do so. *Id*. He also confirmed that he did "understand when [he] plead[ed] guilty [that he] gave up certain rights." *Id*. He confirmed that he was guilty of disorderly conduct. *Id*. Even if all of the evidence that Petitioner presents is "fully credited and accepted as true, the trial record conclusively establishes that [Petitioner's] emotional problems and purported mental illness did not prevent [him] from consulting with counsel to a reasonable degree of rational understanding or from having a rational and factual understanding of the proceedings." *Perez*, 2017 WL 1628902, at *5.

Most notably, Petitioner points to no remarks, behavior, or other conduct that would indicate that he was incompetent to stand trial. Petitioner exhibited no outbursts or other erratic

behavior during his proceedings.  *Cf. United States v. Harry*, 548 F. App'x 690, 692 (2d Cir.

2013) (concluding that even with outbursts, that Petitioner was competent to stand trial).  He

does not point to any need for family assistance to effectively communicate with counsel or any

propensity for self-harm.  His "self-serving assertions of incompetence warrant skepticism."

*Perez*, 2017 WL 1628902, at *5 (citing *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir.

2009)); *see also Puglisi*, 586 F.3d at 214 ("a district court need not assume the credibility of

factual assertions . . . where the assertions are contradicted by the record in the underlying

proceeding.").  In short, Petitioner has not shown that his cognitive functioning was impaired in

any form or manner and his assertion of incompetence after his conviction should be treated with

skepticism.

      In light of Petitioner's actions and his materials, a reasonable attorney "would have

known that a claim that [Petitioner] could not understand the proceedings and assist in h[is]

defense would never succeed, and would reasonably have chosen not to risk his or her credibility

with the court by pursuing a motion doomed to failure."  *Gluzman*, 124 F. Supp. 2d at 176.

Further, because Petitioner has not specifically linked his mental illnesses to his competence to

stand trial or shown that he was actually incompetent to stand trial, Petitioner cannot show a

reasonable probability that the outcome would have differed had there been a mental health

evaluation.  *See Perez*, 2017 WL 1628902, at *4 ("Even if counsel was ineffective in not

investigating Perez's competence and/or not requesting a competency hearing, Perez cannot

establish that she suffered any prejudice.").

      As previously noted, the remainder of the claims as to ineffective assistance of counsel

are untimely and do not relate back to the timely-filed petition.  But even if they did relate back,

those claims would fail.  Those claims have no basis in the record.  Petitioner's counsel was not

required to further object when the court denied his motion to unseal Yusef's arrest records; his counsel *did* question the detective on cross examination that he did not conduct certain tests and did not investigate some leads, Dkt. No. 26 at 349–56; his counsel *did*, in fact, receive an adverse inference charge because the State did not turn over the detective's notes, *id.* at 491–92; and his counsel *did* object to the photo array and the admission of the 911 calls, *id.* at 361–63.  As to any remaining assertions of ineffective assistance, the Court cannot discern any error in the attorney's trial strategy or execution that would rise to a showing of ineffective assistance of counsel under the deferential standard of *Strickland*.

## VI.     Request for *Pro Bono* Counsel

Petitioner also requests that this court appoint him *pro bono* counsel.  Dkt. No. 35.  In his request, he asserts that the "arresting Det. Narvaez g[a]ve [him] a pair of red shorts from [his] house to change," which he asserts "got [him convicted]." *Id*.  He claims that one of the "DD-5," or police reports, show that he was wearing something different at the time he was seen. *Id*.

A district court has "broad discretion" to decide whether to seek *pro bono* representation for a civil litigant. *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986).  However, "a court has no authority to 'appoint' counsel, but instead, may only 'request' that an attorney volunteer to represent a litigant." *Vann v. Sudranski*, 2020 WL 8679706, at *1 (S.D.N.Y. July 8, 2020) (quoting *Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296, 301-10 (1989)). Because "[v]olunteer lawyer time is a precious commodity," *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 172-73 (2d Cir. 1989), "[c]ourts must request the services of *pro bono* counsel sparingly, and with reference to public benefit," *Vann*, 2020 WL 8679706, at *1.  The Second Circuit has set forth factors to guide a court's discretion to appoint counsel to represent an indigent civil litigant under 28 U.S.C. § 1915 in *Hodge*.  Under *Hodge*, the first question is whether the litigant's claims "seems likely to be of substance." *Hodge*, 802 F.2d at 61.

For the reasons previously mentioned Petitioner has not made such a showing that the claim has merit.  The claims that Petitioner presents fail on their merits, if not otherwise procedurally barred.  The request for appointment of counsel is denied.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED.  The request for appointment of counsel is DENIED.  The Clerk of Court is respectfully directed to mail a copy of this Opinion and Order to Petitioner and to close the case.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c)(2).  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is respectfully directed to close Dkt. No. 35.


SO ORDERED.


Dated: January 20, 2023
     New York, New York

                             LEWIS J. LIMAN
                     United States District Judge